## Cassidy, et al. v. E. M. T. Coal Company.

(Decided April 29, 1924.)

### Appeal from McLean Circuit Court.

1. Mines and Minerals—Meaning of Lease to be Determined from all Provisions.—The meaning of a coal lease is to be determined from all of its provisions.

2. Mines and Minerals—Lessor Held Entitled to Forfeit Lease for Nonpayment of Royalties.—Under coal lease providing for advance payment in lump sum on royalties and also providing that

should the lessee default for 90 days in payment of royalties, or fail to pay the minimum royalty per year as provided therein "after the expiration of 'the two first years of this lease," the lessor should have the right to cancel the lease, lessor held authorized to cancel within the two years for nonpayment of royalties to third person under whom lessor held.

3. Mines and Minerals—Summons on Petition to Cancel Sufficient Notice of Election to Cancel Lease.—Summons on petition in suit to cancel a coal lease was sufficient notice of election by lessor to cancel lease.

4. Bankruptcy—Lessor Under Coal Lease Had Right to Cancel After Filing of Petition in Bankruptcy by Lessee.—The filing of a petition in bankruptcy against lessee or sublessee in coal lease did not affect the right of lessor to cancel the lease for default in payment of royalties.

5. Mines and Minerals—Rights Under Cancellation of Lease Not Waived.—That a corporate lessor of coal lands, to preserve its rights and without knowing effect of lessee's bankruptcy, sent its claims for royalty, and for caring for the property, to one connected with the lessee, though it had canceled the lease and was then in possession, was not a waiver of its rights under such cancellation.

6. Bankruptcy—Bankruptcy Court Proper Forum for Assertion of Right to Cancel Lease to Bankrupt, but Upon Refusal to Act State Court May Determine Matter.—Ordinarily, the bankruptcy court is the proper forum for the assertion of a right by the lessor in coal lease to cancel lease held by bankrupt, but such court having dismissed referee's rule requiring lessor to show cause why possession should not be given to trustee, and held that the matter must be litigated in an independent action in the state court, the state court must determine the matter.

7. Mines and Minerals—Mortgage on Property and Rights of Lessee Not Enforced where Lease Canceled.—Where coal lease is canceled, a mortgage against the property and rights of the lessee cannot be enforced as against the lessor.

8. Mines and Minerals—Agreement to Pay Certain Minimum Royalties Held Supported by Consideration.—Where parties to a coal lease were disputing whether a clause of the lease as to production of mines had been lived up to, and also about other matters an oral agreement to pay a royalty on a basis of 100,000 tons a year and at a certain rate, though that much coal had not been gotten out, was supported by a consideration.

SANDIDGE & SANDIDGE and FORMAN & FORMAN for appellant Cassidy.

JOE H. MILLER, R. ALEXANDER and WALTER WILKINS for appellant Lam.

W. P. SANDIDGE for appellant Peters.

H. C. CLAY for appellee.

OPINION OF THE COURT BY COMMISSIONER HOBSON—
Affirming.

The Number Nine Coal Company, which owned what is known as the Bryant lease and the Patterson lease, covering 1,080 acres of land near the town of Island in McLean county, Kentucky, on September 9, 1915, sold and transferred its rights under these leases to H. C. Thompson, and Thompson on September 9, 1915, transferred his rights to the E. M. T. Coal Company. At the time of this transfer a mine had been opened on 80 acres of the land lying west of the railroad and this 80 acres had been worked out. It was necessary to open a new mine on the other side of the railroad. To this end a railroad track had to be built, tipples constructed and shafts sunk. The E. M. T. Company began this work, but before the mine was in full operation the E. M. T. Company sold and transferred its rights on May 1, 1917, to D. T. Evans and R. F. Peters. Evans and Peters spent a large sum of money in finishing the works which the E. M. T. Company had begun and operated the mine until January 9, 1918, when Evans sold out to R. F. Peters and W. H. Ronan, who thereupon organized the Island Block Coal Company and transferred their rights to this corporation on January 9, 1918. Peters and Ronan agreed to pay D. T. Evans $35,000.00 for his rights. Five thousand of this was paid down and fifteen thousand was paid by T. D. Cassidy, who lent them the money upon a mortgage of their rights in the coal property in January, 1919. The Island Block Coal Company operated the leased property from January, 1918, until March 25, 1919. At that time it ceased shipping coal. This was for the reason that after the armistice in November, 1918, the United States government cancelled all its contracts for coal. All their contracts were with the government; the coal market more or less was in a slump and they were unable to get other contracts then. Although they stopped shipping coal, they continued to operate the pumps until April 29th, but on April 29th the men who had not been paid for two weeks refused to work any longer. It was important that the pumps should be run for the reason that the water from the old abandoned mine on the eighty acres would run into the new mine as the slant of the strata was downward in that direction and the new mine would fill with water if the pumps were not run.

H. C. Thompson, L. B. McHargue and D. C. Edwards were the directors of the E. M. T. Coal Company, and in fact owned it. They lived at London, Kentucky; Edwards was president of the company and Thompson was in Colorado for his health. By the contract, the E. M. T. Coal Company was obligated to pay the Number Nine Coal Company a royalty of five cents a ton on the coal mined and also obligated to keep the mine in proper condition.

On April 30th W. J. Taylor at Owensboro, who was the secretary of Number Nine Coal Company, called D. C. Edwards over the long distance telephone and informed him that Mr. Bonner, the banker at Island, had been at Owensboro that day and had told him that the Island Block Coal Company had abandoned the mines over there and were permitting them to fill up with water. Edwards asked him if he couldn't go over there and get somebody to run the pumps for them and look after the mines until some one of them could get on the ground, and he said he would go over the next morning on the train to get somebody to run the pumps until they could get down there.

Edwards then went to the residence of L. B. McHargue and they discussed the matter at some length and decided there was nothing left for them to do except to take possession of the property and to take legal steps that were necessary to cancel the lease and enforce the lien for royalties. They decided that McHargue could get ready to go there in the next few days. On the next day, May 1st, they had a directors' meeting and adopted a resolution which was afterwards written out and spread upon the book.

Taylor went to Island on May 1st and made an arrangement for some of the men to continue working the pumps, he guaranteeing their pay. They started the pumps then. McHargue on May 5th went to Owensboro, where he met R. F. Peters; he and Peters went from Owensboro to Island on the morning train May 6th. They reached Island at nine a. m. and left Island at eleven o'clock together. They returned to Owensboro. On May 7th McHargue came up to Louisville on the train and Peters came up in his car. The next morning, May 8th, they went together to the office of the L. & N. Railroad Company and had an interview with Mr. Shanks, the purchasing agent of the L. & N. Railroad Company, as to a contract by the railroad to buy a large amount of coal. Shanks told them the contract was all right and he

would send it to Peters in a day or two. That evening Peters and McHargue went to Lexington in Peters' car to see T. D. Cassidy, and had quite a conference with him that evening, which was continued the next day. D. C. Edwards was there the second day to assist in that conference, but no agreement was arrived at.

At the conclusion of this conference McHargue gave to Peters a check for $250.00, payable to J. P. Miller, the bookkeeper of the Island Block Coal Company, to pay the men who had operated the pumps since May 1st; they were so paid by him out of this check and other checks furnished by McHargue and the pumps were kept going.

Soon after that conference ended the parties learned that an involuntary petition in bankruptcy had been filed against the Island Block Coal Company on May 6th and that process in that case had been served on May 9th. McHargue and Edwards on May 13th had their attorney to draw a petition against the Island Block Coal Company, which was filed in the McLean circuit court on May 15th. In this petition the lease made by the E. M. T. Coal Company to D. T. Evans and R. F. Peters is set out in full, and it was alleged that a large sum was due and unpaid on the royalties stipulated in the lease; that the lessees had failed to pay the taxes on the property or keep it insured and had practically abandoned the property, and the plaintiff has been compelled to procure workmen to look after and care for the property at the expense of $250.00, no part of which has been paid to the plaintiff; that the plaintiff had elected to and had cancelled the lease and was then entitled to the immediate possession of all of said leased premises, but that the defendant had refused to surrender possession of said property to the plaintiff and still asserted a right thereto under the lease. The plaintiff prayed judgment cancelling the lease, also judgment for the company for $250.00 that it had paid for the preservation and care of the property.

On May 24th the Island Block Coal Company was adjudged a bankrupt; on June 9th William A. Lam was appointed temporary receiver and on June 20th he was elected trustee in bankruptcy of the bankrupt estate. The E. M. T. Coal Company refused to deliver possession to Lam and he obtained a rule against them from the referee to show cause why possession should not be given to him. Upon a hearing of the rule and the evidence in-

troduced by the parties the referee entered a judgment in favor of Lam as trustee, but the district court set aside the judgment of the referee on the ground that this was a question which must be heard in the state court, as the E. M. T. Coal Company claimed to be in possession before the petition in bankruptcy was filed. Thereupon Lam as trustee filed suit in the McLean circuit court against the E. M. T. Coal Company for the possession of the property, and this suit was consolidated with the equity action previously brought by the E. M. T. Coal Company on May 15th above referred to. A large amount of proof was taken and on final hearing the circuit court dismissed Lam's petition and from this judgment Lam appeals.

Cassidy filed an answer and cross-petition seeking the enforcement of his mortgage. His petition was dismissed and he also appeals. A personal judgment was rendered against R. F. Peters in favor of the E. M. T. Coal Company for a balance of $1,791.60, due upon the royalty agreed to be paid. From this judgment Peters appeals.

The first question to be determined in this case is the right of the E. M. T. Coal Company to cancel the lease and take possession of the property under the terms of the contract. By the contract Peters and Evans agreed to pay the E. M. T. Coal Company fifteen cents a ton on all coal mined the first year of the lease, twelve and a half cents a ton on all coal mined the second year and ten cents a ton on all coal mined for the remainder of the term. The royalty was to be paid thus: Five cents a ton during the whole term of the lease to the Number Nine Coal Company as specified in its lease to H. C. Thompson. The remainder of the royalty was to be paid to the E. M. T. Coal Company thus: $5,000.00 cash upon the delivery of the lease and $5,000.00 to be paid in twelve months, evidenced by note for that amount, the two payments of $5,000.00 each to be considered as a payment of royalties in advance to the E. M. T. Coal Company, and after the payment of five cents a ton royalty to the Number Nine Coal Company then all royalties due the E. M. T. Coal Company to be credited on the advance payment of $10,000.00 until the amount of the accumulated royalties equals the advance payment of $10,000.00. It was also provided in the lease that the lessors should pay all taxes on the property after the year 1917

and carry fire insurance of a certain amount on the property. Then follows this provision:

"It is expressly agreed and understood by and between the parties hereto that should the parties of the second part make default for a period of ninety (90) days in the payment of the royalties herein agreed to be paid, or fail to pay the minimum amount of royalty per year, as fixed in the Patterson lease, namely, twenty-five tons, at 10 cents per ton, after the expiration of the two first years of this lease, then in either or all of these events, the party of the first part shall have the right to cancel this lease, immediately upon such default, and the parties of the second part will surrender peaceable possession of said leased property to the party of the first part without further notice."

It is insisted for appellants that the words "after the expiration of the two first years of this lease" qualify both conditions and that the clause has no application to the two first years of the lease. The meaning of the contract is to be determined from all of its provisions. The $10,00.00 was paid to the E. M. T. Coal Company as a payment in advance on the royalty coming to it under the lease; no part of this money was paid on royalty due the Number Nine Coal Company. There could be no default in paying the royalty to the E. M. T. Coal Company until the advance payment of $10,000.00 was extinguished, but there could be a default in the payment of the royalty to the Number Nine Coal Company if the payments to it were not made to it monthly as required by the contract. The natural meaning of the contract taken as a whole is that two defaults are provided for: One, a default in the payment of royalty due for a period of ninety days. Two, a failure to pay the minimum royalty of twenty-five thousand tons at 10 cents per ton after the expiration of the two first years of the lease. The royalty of 5 cents a ton to the Number Nine Coal Company was to be paid monthly and was so paid from the date of the lease until October, 1918, but none was paid after this and this royalty had been due and unpaid for a period of ninety days on May 1, 1919. This gave the E. M. T. Coal Company the right to cancel the lease and required the lessees to surrender peaceable possession of the leased property to it without further notice.

The E. M. T. Coal Company claims that it did elect on May 1st to cancel the lease and did then take possession of the leased property five days before the petition in bankruptcy was filed. An order entered on the minute book of that company of date May 1st is produced to show this, but the evidence is very indefinite as to when this order was entered. It is conceded by Mr. Edwards that it may not have been entered for a week afterwards, and from the language of the order we are satisfied it was not entered until after May 9th at least, for it recites that the company had paid large sums in caring for the property and it had paid nothing for this until the check was given on May 9th. The language of this order and the language of the petition drawn on May 13th is so similar as to indicate that they were drawn at the same time. In addition to this the conduct of McHargue on and after May 5th is strongly confirmative of the testimony of Peters that he and McHargue were aiming then to mature arrangements by which the Island Block Coal Company could go on with the mine. McHargue only stayed at the mine about two hours. While there he put in Ronan in place of Devins in charge of the pumping work, and Ronans was evidently put in to save expense and consented to do the work in the hope of their going ahead with the lease. The conduct of the parties at Louisville also confirms this. Peters was expecting to get for the Island Block Coal Company from the L. & N. Railroad Company a large contract to deliver coal to it, and the purpose of their visit to Louisville was plainly to see if this contract was forthcoming. If the lease had been cancelled this was wholly unnecessary. After they learned that the contract would be delivered in a day or two they then went to Lexington and had a long conference with Mr. Cassidy about putting up more money; evidently Cassidy was to put up the money for the Island Block Coal Company, and he could not be expected to do this if the lease was cancelled. There is much else in the record supporting the conclusion that there was no election by the E. M. T. Coal Company to exercise its right to cancel the lease and that no notice was given of such an election until it filed its petition in the McLean circuit court on May 15th; but this petition was sufficient for that purpose. After it was filed the E. M. T. Coal Company furnished other money and in fact took possession of the mines and was in possession when the trustee in bankruptcy demanded pos-

session of the property after his appointment. But this was all after the petition in bankruptcy was filed.

The question then arises, could this election be exercised after the filing of the petition in bankruptcy? There seems to be little authority on this question. In 3 Remington on Bankruptcy, section 1219, the rule is thus stated:

"The landlord's previous exercise of the right to forfeit the lease is not avoided by the tenant's bankruptcy; except of course where the subsequent bankruptcy operates to nullify or remove the ground of forfeiture itself. Nor, on principle would any right of forfeiture after bankruptcy be taken away from the landlord; so that, if such right of forfeiture was given in the lease and was exercised after the bankruptcy by the landlord, the trustee would become a mere trespasser thereafter. These rights of forfeiture are always subject, however, to the usual allowance of a reasonable time for effecting a removal, under the doctrine of the preceding section 1218."

And again in section 1424:

"The trustee is bound by all forfeiture clauses and rent covenants of the bankrupt. Thus, where forfeiture of a long term lease was declared before bankruptcy for failure to build as covenanted, the trustee is bound by the forfeiture and the bankruptcy court will enforce it. But he may urge that forfeiture has been waived by the conduct of the parties. The trustee takes title to leaseholds subject to the right of forfeiture exercised after, as well as before, the bankruptcy."

The only case cited to sustain the text is In Re Elkbrook Coal Company, 261 Fed. 445, which is a decision of a district court in Pennsylvania, but is well reasoned and fully sustains the text. The question seems not to have arisen in any other case, but upon principle neither the landlord nor the trustee gain or lose any rights by the bankruptcy; the trustee succeeds merely to the rights of an attaching creditor of the bankrupt. Where a lease contains a forfeiture clause the right to terminate it is a continuing right in the landlord, and it is hard to see why the bankruptcy of the Island Block Coal Company should affect the rights of the E. M. T. Coal Company under its

lease made to Evans and Peters. It is true they had assigned their lease to the Island Block Coal Company and the Island Block Coal Company had for months made payments on the royalty as provided in the contract, but the E. M. T. Coal Company had done nothing to waive in any way any of its rights under its contract with Evans and Peters.

The fact that the E. M. T. Coal Company took no action on May 1st to cancel the lease or give notice of its intention to do so was not a waiver of its right, which was a continuing right, recurring every day as long as the royalty remained unpaid, for the situation was this: The E. M. T. Coal Company had to pay the Number Nine Coal Company its royalty to preserve its rights if its lessees failed to pay.

The summons on the petition of the E. M. T. Coal Company against the Island Block Coal Company filed May 15th, was served on Peters on May 20th and on Ronan May 23rd. This petition was sufficient notice of its election to cancel the lease and at that time the E. M. T. Coal Company had spent in caring for the property about $850.00, in addition to the $250.00 above referred to. Ronan had dropped out; the men in charge of the plant, as shown by the testimony, were the employes of the E. M. T. Coal Company and it was in fact in possession of the property. The petition was afterwards amended, and the proof sustains the allegations of the amendment to the effect that the stenographer in copying the petition by oversight omitted some of its allegations as to possession of the property. To show a waiver of its right and that no cancellation of the lease was ever made, much reliance is placed on the letter of McHargue to Peters of date June 2nd, in which he sends Peters their claims against the Island Block Coal Company, which include royalty to June 1st and all payments made in caring for the property up to the same date. But it must be borne in mind that this is the letter of a business man and not a lawyer. McHargue did not know the effect of the bankruptcy proceedings, or what force would be given to their taking possession after the petition in bankruptcy was filed. The question was unsettled and has given this court no little difficulty. The letter was plainly written to simply preserve all their rights and was not a waiver of any right they had. They were then in possession of the property and had been for some days.

It is true that where the lease contains a forfeiture clause and is forfeited after bankruptcy the forum for the assertion of rights consequent thereon is ordinarily the bankrupt court and not the state court; but in this case the matter was presented to the bankrupt court and it dismissed the rule which had been awarded by the referee in bankruptcy holding that the matter must be litigated in an independent action in the state court. As the question is in the state court for final decision it must be determined on its merits. The trustee in bankruptcy only succeeded to the rights of the bankrupt or to the rights of an attaching creditor of the bankrupt. The lessor had the same right to cancel the lease and take possession of the property pursuant to the terms of the lease as he had before the petition in bankruptcy was filed. The circuit court properly so held, and on the appeal of W. A. Lam, trustee, the judgment is affirmed.

What we have said disposes of the appeal of T. D. Cassidy, for his mortgage was only on the property of the Island Block Coal Company, including its rights under the lease, and the lease being cancelled his mortgage cannot be enforced.

The judgment against Peters rests upon these facts: On November 23, 1917, to settle a dispute between them and the E. M. T. Coal Company as to the amount of the royalties payable to that company, a written contract was made by which it was agreed that they would pay a royalty on the basis of one hundred thousand tons a year at the rate of 12½ cents a ton from May 1, 1917, to November 1, 1917, although they had not gotten out that much coal; and then by oral agreement which was not reduced to writing but which is admitted by all parties the same scale of royalties was to be carried out for the remainder of the term, and in fact all the payments made from that time were made on this basis, although that much coal had not been mined. The judgment against Peters is for the balance due on the royalties to the E. M. T. Coal Company under this oral agreement. Two objections are raised: One, that the petition shows no consideration for the agreement; two, there was no consideration for it.

The defect in the petition is cured by the proof. No objection was made to the petition in the circuit court. The proof shows an ample consideration for the verbal agreement. The parties were disputing as to whether the clause of the lease had been lived up to which required

that the production of the mines should be increased to five thousand tons per day. They were also disputing as to certain cars that had been sold and taken away from the mines. The oral agreement was based upon ample consideration.

Judgment affirmed.